## UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **TIMOTHY GOODRICH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **2:14-cv-00037-JDL** |
| | ) | |
| **WELLPOINT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### ORDER ON THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Timothy Goodrich has sued his former employer, WellPoint, Inc., alleging one count of disability discrimination in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* (2015) ("ADA"), and a second count of disability discrimination under the Maine Human Rights Act, 5 M.R.S.A. § 4551, *et seq.* (2014) ("MHRA"). WellPoint has moved for summary judgment as to both counts. ECF No. 24. For the reasons set forth below, WellPoint's motion is granted in part and denied in part.

## I. FACTUAL BACKGROUND

WellPoint is a company that provides healthcare benefits as an independent licensee of the Blue Cross and Blue Shield Association. ECF No. 25 at 1. In January 2012, Goodrich took a leave of absence from his position as an analyst for WellPoint's Federal Employee Program Workforce Management Team due to persistent back pain. ECF No. 28 at 4.

In May 2012, while still on leave, Goodrich underwent back surgery and by late June he had exhausted his short-term disability benefits. *Id.* Goodrich's leave

file was referred to Kathleen Jeffries, a member of WellPoint's Leave of Absence unit, to determine whether additional leave was merited.   ECF No. 25-8 at 3.  Jeffries approved additional leave time as an accommodation under the ADA, ECF No. 28-1 at 11, and after further layers of review, WellPoint granted long-term disability benefits to Goodrich, ECF No. 28 at 5.

In July 2012, Goodrich's manager, Jennie Broyles, wrote to Jeffries requesting that Jeffries authorize her to replace Goodrich because his continuing leave was imposing an "undue hardship" on her team and was jeopardizing its ability to meet business expectations.  ECF No. 25-5 at 3, 5-6.  WellPoint announced a vacancy for Goodrich's position in September 2012.  *Id.* at 3.  Despite being replaced, Goodrich remained a WellPoint employee.  ECF No. 25-1 at 4.  He was informed that he would need to apply for a new position at WellPoint, *id.,* and the company granted Goodrich several extensions of his disability leave through March 9, 2013, ECF No. 25-4 at 4.

Goodrich's neurosurgeon, Dr. James Wilson, cleared him to return to work effective January 28, 2013, but recommended that WellPoint provide Goodrich with a sit-stand station and an ergonomic assessment upon his return.  ECF No. 28-8 at 4.  Wilson also recommended that Goodrich return to work on a limited schedule of 24 hours for the first week, 32 hours for the second week, and 40 hours for the third week.  *Id.*

In February 2013, Goodrich applied for a position as a workforce management analyst on a team managed by Jason Toot.  ECF No. 28-10 at 8.  Although Toot did not want to hire Goodrich, *id.*, WellPoint's human resources department told Toot

2

that Goodrich's situation was urgent, *Id.* at 12.  Goodrich was ultimately offered the position and reported for work on March 11 on a full-time, 40-hour per week basis. ECF No. 25-1 at 5.

Approximately one month later, on April 10, Goodrich emailed Toot to inform him that his pain medication occasionally made him sick, and to ask if he could participate in WellPoint's work at home program.  ECF No. 28 at 9.  Toot understood Goodrich's request as one for a medical accommodation, ECF No. 28 at 10; ECF No. 34 at 21-22, and the two met to discuss the request the next day, ECF No. 25-7 at 4. At the meeting, Toot told Goodrich that working from home was only permitted after a three-month probationary period, and only after employees have "demonstrate[d] clear understanding of processes/procedures."  ECF No. 28-10 at 14; ECF No. 25-7 at 4.  Goodrich told Toot that he was also in the process of submitting medical documentation to Jeffries to obtain an intermittent leave of absence for days that his medication prevented him from being able to work in the office.  ECF No. 25 at 12. On April 12, Jeffries wrote to Goodrich to inform him that she had granted his request for intermittent leave, which permitted him to take 8 hours' leave one to two times per month as necessary.  ECF No. 25-3 at 35-36.

On April 16, 2013, Goodrich was examined by his family physician, Dr. Jill Mahoney, and he told her that his back pain had worsened.  ECF No. 28-12 at 2. Mahoney wrote a letter to Cheryl Flippo, WellPoint's Lead Disability Case Manager, and recommended that Goodrich "stop work immediately and resume long term disability."  ECF No. 25-3 at 37.  Mahoney also warned that "if [Goodrich] continues

3

his current employment, it will further aggravate his chronic back pain and spasm." *Id.* She indicated on a separate form that Goodrich "probably will not be able to [return to work full time] due to symptoms." *Id.* at 38. Mahoney's recommendation was based on her understanding that WellPoint would not permit Goodrich to work from home. ECF No. 28-12 at 4.

Upon receipt of Mahoney's letter, Flippo began a review of Goodrich's long-term disability eligibility by requesting and forwarding Goodrich's medical records to a WellPoint nurse, Beth Szopinksi, for review. ECF No. 28-5 at 2-3. Szopinksi concluded that the severity of Goodrich's condition did not prevent him from performing the essential functions of a sedentary job. *Id.* at 3-4, 11. Based upon Szopinksi's assessment, Flippo discontinued Goodrich's long-term disability benefits in July 2013. *Id.* at 11; ECF No. 34 at 40.

Mahoney's assessment was also sent to Jeffries, who concluded that Goodrich would never be able to return to work. ECF No. 25-8 at 4, 5-6. On May 6, Human Resources Manager Suzanne Hagerty wrote to Goodrich to inform him that WellPoint had terminated his employment, effective May 14. *Id.* at 5-6.

On May 28, 2013, Goodrich filed a Charge of Discrimination against WellPoint with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination and a failure to accommodate his request to work from home. ECF No. 25-10. On January 30, 2014, Goodrich filed this lawsuit against WellPoint. ECF No. 1.

## II. SUMMARY JUDGMENT STANDARD

### A.    Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014). In making that determination, a court must view the evidence in the light most favorable to the non-moving party. *Johnson v. Univ. of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013). "[A] judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (citations and quotations omitted).

### B.    Local Rule 56

Local Rule 56 defines the evidence that this court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment. First, the moving party must file a statement of material facts that it claims are not in dispute, with each fact presented in a numbered paragraph and supported by a specific citation to the record. *See* Loc. R. 56(b).

Second, the non-moving party must submit its own short and concise statement of material facts in which it admits, denies, or qualifies the facts alleged by the moving party, making sure to reference each numbered paragraph of the moving party's statement and to support each denial or qualification with a specific citation to the record. Loc. R. 56(c). The non-moving party may also include its own

additional statement of facts that it contends are not in dispute. *Id.* These additional facts must also be presented in a numbered paragraph and be supported by a specific citation to the record. *Id.*

Third, the moving party must then submit a reply statement of material facts in which it admits, denies, or qualifies the non-moving party's additional facts, if any. Loc. R. 56(d). The reply statement must reference each numbered paragraph of the non-moving party's statement of additional facts and each denial or qualification must be supported by a specific citation to the record. *Id.*

The court may disregard any statement of fact that is not supported by a specific citation to the record, Loc. R. 56(f), and the court has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2). Properly supported facts that are contained in a statement of material or additional fact are deemed admitted unless properly controverted. Loc. R. 56(f).

## III. LEGAL ANALYSIS

### A.   Disability Discrimination Based on WellPoint's Termination of Goodrich's Employment

To prove disability discrimination pursuant to the ADA and the MHRA, Goodrich must demonstrate the following: first, that he suffers from a disability; second, that he is qualified to perform the essential functions of the job, with or without reasonable accommodation; and third, that he was discharged or otherwise suffered an adverse employment action by WellPoint based in whole or in part on his

6

disability. *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 86-87 (1st Cir. 2012); *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 14, 824 A.2d 48. *See also, Dudley v. Hannaford Bros. Co.,* 190 F. Supp. 2d 69, 73 (D. Me. 2002), *aff'd* 333 F.3d 299 (1st Cir. 2003) ("Courts have interpreted the ADA and MHRA statutes as coextensive.").

Summary judgment motions involving ADA discrimination claims are evaluated with the "shifting burdens" analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir. 1999). Thus, once Goodrich presents prima facie evidence of the three required elements, WellPoint assumes the burden of producing prima facie evidence of a legitimate, non-retaliatory reason for his discharge, after which the burden returns to Goodrich to produce prima facie evidence that the reason offered by WellPoint is pretextual. *See Freadman v. Metro. Prop. and Cas. Ins. Co.,* 484 F.3d 91, 99 (1st Cir. 2007); *see also, Fuhrmann v. Staples Office Superstore East, Inc.*, 2012 ME 135, ¶ 13, 58 A.3d 1083.

### 1. Goodrich's Qualification to Perform the Essential Functions of the Job, With or Without Reasonable Accommodation

There is no dispute that Goodrich suffers from a disability and that WellPoint terminated his employment because of his disability. *See* ECF No. 24 at 1. Therefore, WellPoint's argument turns on the second "qualification" prong.

The ADA defines a "qualified individual" as follows:

[A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.

42 U.S.C.A. § 12111(8).[1]  In order to be a "qualified individual" under the ADA, "the burden is on the employee to show: first, that she possesses the requisite skill, experience, education and other job-related requirements for the position, and second, that she is able to perform the essential functions of the position with or without reasonable accommodation."  *Garcia-Ayala v. Lederle Parenterals, Inc.,* 212 F.3d 638, 646 (1st Cir. 2000) (internal citations and quotation marks omitted).

WellPoint does not allege that Goodrich lacked the necessary skill, experience, education, or other job-related requirements.  Instead, it focuses its argument on Goodrich's inability to do the "essential functions" of the job, *see* ECF No. 24 at 6, which are defined in the EEOC guidelines as "the fundamental job duties of the employment position the individual with a disability holds or desires."  29 C.F.R. § 1630.2(n)(1) (2014).

WellPoint argues that Goodrich is not a qualified individual under the ADA or the MHRA because, according to Goodrich's supervisor, Jason Toot, attendance was an essential function of Goodrich's job.  ECF No. 24 at 6 (citing ECF No. 25-7 at 3). WellPoint contends that Goodrich could not perform this essential function because his doctor, Jill Mahoney, recommended on April 16, 2013, that he should "stop work immediately and resume long term disability," and warned that "if [Goodrich] continues his current employment, it will further aggravate his chronic back pain and spasm." ECF No. 25-3 at 37.  Mahoney also indicated in a separate Health Care

---

[1]  The MHRA's definition of a "qualified individual with a disability" is substantively the same: "an individual with a physical or mental disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that the individual holds or desires."  5 M.R.S.A. § 4553(8-D).

Provider Statement that Goodrich "probably will not be able to [return to work full time] due to symptoms." *Id.* at 38.  Thus, WellPoint argues that because attendance was an essential function of Goodrich's job, and his doctor indicated twice that he could not work in any capacity, Goodrich cannot establish that he was a "qualified individual." ECF No. 24 at 6.

In response, Goodrich cites conflicting evidence that WellPoint considered him able to perform the essential functions of his job.  ECF No. 30 at 9.   Specifically, Cheryl Flippo, WellPoint's Lead Disability Case Manager, testified at her deposition that she discontinued Goodrich's long term disability benefits after he was terminated because she and WellPoint nurse Beth Szopinski reviewed his medical records and concluded that he was able to perform the essential functions of his job. No. 28-4 at 9-10; ECF No. 28-5 at 3-4, 11 ("[Szopinski] did not see severity as to prevent [Goodrich] from working a sedentary occupation.").

Flippo's testimony establishes a dispute of material fact as to whether Goodrich was able to perform the essential functions of his job, and therefore whether he was a "qualified individual" under the ADA and MHRA.  Goodrich has thus established a prima facie case of disability discrimination based upon his termination.

### 2. Pretext – Termination

Goodrich concedes that WellPoint satisfied its burden to articulate a non-discriminatory reason for his termination by asserting that he was unable to work "under any circumstances." ECF No. 30 at 9.  Therefore, I turn to the issue of pretext.

Inconsistencies in an employer's case may be sufficient to support an inference of pretext. *See Soto-Feciliano v. Villa Cofresi Hotels, Inc.,* 779 F.3d 19, 29 (1st Cir. 2015). "One way a plaintiff can establish pretext is by showing weaknesses, inconsistencies, and contradictions in the employer's proffered legitimate reasons for termination." *Trafton v. Sunbury Primary Care, P.A.,* 689 F. Supp. 2d 180, 197 (D. Me. 2010) (citing *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000)). Viewed in the light most favorable to Goodrich, Flippo's testimony that she and a WellPoint nurse considered Goodrich able to perform the essential functions of his job directly contradicts WellPoint's assertion that it terminated Goodrich's employment because of his inability to work. *See* ECF No. 28-5 at 11. Given this contradiction, a reasonable jury could conclude that WellPoint's proffered, legitimate reason for terminating Goodrich's employment was a pretext.[2]

WellPoint's motion for summary judgment is therefore **DENIED** with regard to Goodrich's claim for disability discrimination based upon termination.

## B.   Disability Discrimination Based on the Denial of Long-Term Disability Benefits

WellPoint argues that Goodrich cannot maintain a claim for disability discrimination based upon its denial of long-term disability benefits because Goodrich did not raise the issue in his Charge of Discrimination before the EEOC and therefore

---

[2] At the hearing, WellPoint argued that Cheryl Flippo was not a WellPoint employee, but was instead an employee of Anthem. WellPoint therefore contended that her conclusion that Goodrich is able to perform his job's essential functions cannot establish that WellPoint has adopted inconsistent positions. This argument was not made in WellPoint's summary judgment brief. *See* ECF No. 24. It also does not square with Flippo's deposition testimony in which she identified her "current position with Well Point" as "lead disability case manager." ECF No. 28-4, p. 3-4.

failed to exhaust his administrative remedies.  ECF No. 24 at 14-15.  Although there is a fleeting reference to long-term disability benefits in Goodrich's EEOC Charge, ECF No. 25-10 at 2 ("I was offered a position after LTD that was the equivalent of a demotion"), it does not contain an allegation that WellPoint ever wrongfully denied such benefits, *see id.*

Goodrich contends that any alleged failure to raise the issue of long-term disability is no more than "an obvious drafting error on an agency discrimination-reporting form by a pro se complainant" and that WellPoint was "on adequate notice that the claim encompassed more than a single incident."  ECF No. 30 at 12, n.1 (citing *Chaloult v. Interstate Brands Corp.*, 2003 WL 21803319, at *18 (D. Me. Aug. 6, 2003)).  Alternatively, Goodrich asserts that he did raise the issue in his EEOC Charge because he submitted type-written notes to the EEOC during its investigation in which he alleged that WellPoint's denial of long-term disability benefits was part of a pattern of discrimination against him.  *Id.* (citing ECF No. 28-8 at 5).

Before filing an ADA claim in federal court, a plaintiff must exhaust his administrative remedies with the EEOC.  *Thornton v. United Parcel Serv., Inc.,* 587 F.3d 27, 31 (1st Cir. 2009).  A charge not made within 180 days of the event becomes time barred.  42 U.S.C.A. § 2000e-5(e)(1); *Thornton,* 587 F.3d at 31 (requirements for exhaustion of administrative remedies under Title VII also apply to claims under the ADA).  The administrative charge affords "the EEOC with a jurisdictional springboard to investigate the alleged discrimination, *Powers v. Grinnell Corp.*, 915 F.2d 34, 38 (1st Cir. 1990) (internal quotations omitted), and provides "an opportunity

to eliminate the alleged unlawful practices through informal methods of conciliation," *id.* at 37 (citing *Kloos v. Carter-Day Co.,* 799 F.2d 397, 400 (8th Cir.1986)).  The EEOC charge need not exactly predict the pleadings in subsequent litigation before the district court.  *Id.* at 38-39.  Instead, "the critical question is whether the claims set forth in the civil complaint come within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* at 39 (quoting *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970) (internal quotation marks omitted)).

Here, Goodrich's claim of discriminatory denial of long-term disability benefits could reasonably be expected to grow out of the claim of discriminatory termination contained in his EEOC charge.  Both claims allege disability discrimination under the ADA and the MHRA and both relate back to the same predicate facts concerning Goodrich's back pain and spasm.  WellPoint's denial of long-term disability benefits occurred in July 2013—approximately three months after it terminated Goodrich's employment, ECF No. 34 at 40—and both actions involved review of Mahoney's letter and Health Care Provider Statement, ECF No. 24 at 6; ECF No. 28-5 at 2-3.  Therefore, WellPoint's summary judgment motion is **DENIED** with regard to its denial of long-term disability benefits to Goodrich.

## C.    Disability Discrimination Based on a Failure to Accommodate

To state a disability discrimination claim based upon a failure to accommodate, a plaintiff must show that: (1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or

without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request. *Henry v. United Bank*, 686 F.3d 50, 59-60 (1st Cir. 2012). The employee bears the initial burden of making a sufficiently direct and specific request for accommodation, unless the employer otherwise knew that one was necessary. *Jones,* 696 F.3d at 89 (citing *Freadman*, 484 F.3d at 102). The employee must also explain how the accommodation is linked to the employee's disability, meaning "not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought." *Id.* (quotation omitted).

### 1. Goodrich's Request for a Reduced Work Schedule

Goodrich alleges that WellPoint failed to reasonably accommodate his disability by failing to permit him to work on a reduced weekly schedule. He contends that when he returned to work from his 14-month medical leave in March 2013, WellPoint did not permit him to return on a reduced schedule as he claims he requested and as his neurosurgeon, Dr. James Wilson, recommended. ECF No. 30 at 13; ECF No. 28 at 6. For support, Goodrich cites a January 21, 2013, Health Care Provider Statement in which Wilson recommended the following:

> Transition back to work: 1/28/13
> Week 1: 24 hours, stand, sit, walk to manage discomfort
> Week 2: 32 hours,
> Week 3: 40 hours,

ECF No. 28-8 at 4. Goodrich contends that despite this recommendation, he was required to work 40 hours per week when he returned to WellPoint on March 11. ECF No. 28 at 9.

WellPoint does not dispute that it received Wilson's recommendation.   It contends that Goodrich "never raised any objection to the number of hours he worked until filing this lawsuit," ECF No. 24 at 11, and cites a February 8 email from Jeffries to Goodrich.  In the email, Jeffries stated that, in light of Wilson's recommendation, "I have extended your approved leave through 2/28/13, which is just over 30 calendar days from the release date of 1/28/13," ECF No. 25-4 at 20.

The parties thus offer differing interpretations of Wilson's recommendation. Goodrich argues that the reduced schedule "would not become effective until [he] actually began to work."  ECF No. 28 at 6 (citing ECF No. 28-11 at 2).  WellPoint, on the other hand, argues that Wilson cleared Goodrich to return to work as of January 28, 2013, and that Goodrich could work 40 hours per week by the beginning of "Week 3" identified in the Wilson report, or February 11, 2013.  ECF No. 25 at 7.

Because I must draw all reasonable inferences in Goodrich's favor as the nonmovant, I treat the reduced schedule recommended by Wilson as a request for an accommodation to take effect whenever Goodrich actually returned to work.  However, this inferred fact does not necessarily mean that WellPoint failed to accommodate Goodrich's request.   "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation."  *Freadman,* 484 F.3d at 104 (quoting 29 C.F.R. § 1630.2(o)(3) (2014)).  Both the employer and employee then have an obligation to "engage in a meaningful dialogue" to find the best means of

14

accommodating the employee's disability through a "flexible, interactive process." *Id.* (internal quotations omitted).

Here, there was an informal, interactive process as evidenced by Jeffries' February 8 email to Goodrich, in which she explained her understanding of Wilson's recommendation and told Goodrich that she was extending his medical leave in response. ECF No. 25-4 at 20. There is no evidence in the record that Goodrich responded to Jeffries' email—either to correct her understanding of what Wilson had recommended or to object to her approval of additional leave. Like the employer in *Freadman,* WellPoint granted the request it thought had been made and, under the circumstances, offered Goodrich a reasonable accommodation. *See Freadman*, 484 F.3d at 104. Because it is undisputed that Goodrich did not engage in a meaningful dialog with WellPoint after learning of the accommodation adopted by WellPoint as set forth in Jeffries' email, Goodrich cannot now argue that WellPoint discriminated against him by failing to offer him something different. *Id.* (citing *Webster v. Methodist Occupational Health Ctrs., Inc.,* 141 F.3d 1236, 1238 (7th Cir. 1998)).

Therefore, WellPoint's motion for summary judgment is **GRANTED** in favor of WellPoint with regard to Goodrich's claim that it failed to reasonably accommodate his request to return to work on a reduced schedule.

### 2. WellPoint's Failure to Keep Goodrich's Job Position Open

Goodrich also alleged in his Complaint and Statement of Material Facts that WellPoint failed to keep his position open and replaced him while he was on medical leave in August 2012. ECF No. 1 at 3 ("Ms. Broyles did fill Plaintiff's position."); ECF

No. 28 at 6 ("Broyles . . . sent Goodrich a letter stating that she would be posting and filling his position with another candidate. The letter stunned Plaintiff[.]"). It is unclear from the Complaint whether Goodrich intended these factual allegations to form the basis of a claim of disability discrimination or failure to accommodate. In his opposition to summary judgment, Goodrich failed to address WellPoint's argument that it was unreasonable and would have created an undue hardship for it to reserve Goodrich's vacant position during the open enrollment season for federal employees, a time when the workload for Goodrich's former team was at its peak. *See* ECF No. 30; *see also,* ECF No. 24 at 10 (citing *Garcia-Ayala,* 212 F.3d at 650). WellPoint seeks summary judgment as to this issue and, at the hearing, Goodrich represented that he does not wish to pursue the issue.

Accordingly, summary judgment is **GRANTED** in favor of WellPoint with regard to Goodrich's claim that WellPoint failed to offer him a reasonable accommodation when it filled his position while he was on medical leave.

### 3. Goodrich's Request to Work from Home

On April 10, 2013, Goodrich requested permission to work from home because the pain medication he took for his back pain occasionally made him sick. ECF No. 28-10 at 13. He alleges that WellPoint failed to reasonably accommodate this request by refusing to engage in an interactive dialogue with him as required by the ADA's regulations. ECF No. 30 at 14; *see also,* 29 C.F.R. § 1630.2(o)(3). WellPoint counters that it did engage in an interactive dialogue with Goodrich when Toot met with him on April 11. ECF No. 25 at 12; ECF No. 29 at 6.

16

The ADA's regulations state that it may be necessary for the employer to initiate an "informal, interactive process" with a disabled employee in order to determine the appropriate reasonable accommodation for the employee.  29 C.F.R. § 1630.2(o)(3).  The First Circuit has noted that this obligation on the part of the employer is not "crystal clear," *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 24 (1st Cir. 2004), although the employer does not have the "unreasonable burden of raising and discussing every conceivable accommodation with the disabled employee," *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 109 (1st Cir. 2005).  "The interactive process is to be informal and a means of uncovering *potential* reasonable accommodations that could overcome the employee's disability."  *Id.* (emphasis in original) (quotation marks omitted).  The refusal to grant the specific accommodation requested by a plaintiff does not necessarily amount to bad faith, so long as the employer makes an earnest attempt to discuss other potential reasonable accommodations.  *E.E.O.C. v. Kohl's Dept. Stores, Inc.,* 774 F.3d 127, 133 (1st Cir. 2014).

Here, there is no dispute that Goodrich approached Toot and requested permission to work from home as an accommodation for his back pain and the medications he took for it.  ECF No. 34 at ¶¶ 69-72.  There is also no dispute that when Toot and Goodrich met on April 11, they did so without a human resources manager present, despite WellPoint's policy of including the local human resources manager in interactive process meetings.  *See* ECF No. 28-1 at 3-4.  The parties agree on nothing else.

17

WellPoint asserts that, at the April 11 meeting, Goodrich told Toot that he understood that his new position was one which required him to work from WellPoint's South Portland office. ECF No. 25 at ¶ 56. WellPoint also asserts that Goodrich told Toot that he thought there was a requisite trial period during which employees must work in the office before being allowed to work from home, and asked whether he would be able to work from home in the future according to that policy. *Id.* at ¶ 57. Goodrich denies both of these alleged facts, *see* ECF No. 29 at ¶¶ 56, 57, stating that he "requested an accommodation to work from home to alleviate his back pain . . . [and] Toot acknowledged that [he] made the subject request for accommodation," *id.* Neither of these denials contradict WellPoint's alleged facts, however.

WellPoint also contends that Toot did not deny Goodrich's request to work from home, but instead told him that all employees were required to work on-site in the office for the duration of the requisite three-month probationary period while they completed training and demonstrated competence in the team's computer systems. ECF No. 25 at ¶ 58. WellPoint further asserts that Toot told Goodrich that they could revisit his request at the end of the three-month probationary period. *Id.* at ¶ 59. Goodrich also denies these facts. ECF No. 29 at ¶¶ 58, 59. Yet upon closer scrutiny, I find that these denials are supported by evidence that Goodrich has taken out of context or are otherwise without foundation. For example, in denying that all employees were required to work on-site for three months, Goodrich asserts that two other workers in his unit "requested to work from home [and] did not have to wait

the alleged requisite probationary period." *Id.* at ¶ 58. Goodrich cited Toot's deposition testimony for support, but the cited testimony reveals merely that there was no probationary period for workers who had already worked under Toot for more than three months when the work-from-home program was established. ECF No. 28-9 at 9.

Finally, Goodrich denies that Toot told him that they could revisit his work from home request at the end of the three-month probationary period. ECF No. 29 at ¶ 59. While I accept this denial for summary judgment purposes, it nevertheless does not establish that WellPoint failed to engage in the interactive process required by ADA regulations. Even assuming that Toot did not explicitly state that he and Goodrich could revisit the issue in three months, it is in the nature of a "probationary" period that working from home will be revisited at the end of the period. Thus, Toot did not deny Goodrich's request to work from home outright, and, as a matter of law, WellPoint did not "simply reject[] *any* request for accommodation without further discussion." *Tobin*, 433 F.3d at 109 (emphasis added). WellPoint provided Goodrich with a timeframe for when his request to work from home would be reconsidered. [3]

The undisputed facts demonstrate that WellPoint engaged in an interactive process with Goodrich. That conclusion does not, however, end the analysis. The

---

[3] Goodrich also contends in his denial that "Toot did not limit the probationary period to 3 months; he . . . told [Goodrich] the probationary period was one year." ECF No. 29 at ¶¶ 58, 59 (citing ECF No. 28-10 at 14). For support, Goodrich cites an instant-message exchange between Toot and his supervisor, Trish Ferguson. ECF No. 28-10 at 14. In fact, while Toot and Ferguson discussed the possibility of requiring a one-year probationary period for Goodrich, they ultimately concluded that "the original stipulation was at least 3 months in the office" before a work-from-home arrangement would be considered, and noted that "thats [sic] what he [Goodrich] accepted the position based on." *Id.* at 15. This evidence actually supports the notion that Goodrich knew of the three-month probationary period and knew that any request to work from home would be reconsidered.

ADA regulations state:  "To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3).  An employer can demonstrate its good faith effort to determine the appropriate reasonable accommodation "in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 317 (3d Cir. 1999). *See also, Kohl's Dept. Stores, Inc.,* 774 F.3d at 133.

The April 11 meeting between Goodrich and Toot demonstrates that WellPoint initiated an interactive process in response to Goodrich's accommodation request that he be permitted to work from home.  It does not demonstrate that WellPoint took steps to determine the appropriate reasonable accommodation.   WellPoint's statements of material fact state that Toot explained to Goodrich that WellPoint's "Workforce Management department required that all employees assigned to an office on the team work in the office for three months while they complete the training and introductory period in order to learn the complex computer system and demonstrate competence in those systems."  ECF No. 25 at 12.  There is no indication

in WellPoint's stated material facts that either Toot or the Workforce Management department considered shortening or otherwise modifying the three-month requirement in light of Goodrich's disability.

The same is true of Toot's April 30th email: neither Toot nor Ferguson make any mention of Goodrich's disability or of the need to consider the possibility of shortening or modifying the three-month requirement. *See* ECF No. 28-10 at 14-15. Rather, they explicitly entertained, but then rejected, the possibility of recommending that Goodrich's probationary period be increased to one year. *Id.* at 15. It is also undisputed that Toot did not ask for any medical documentation related to Goodrich's request, ECF No. 28 at 12; Toot met with Human Resources to discuss Goodrich's accommodation request on April 30, 2013, ECF No. 28 at 15-16; no further action was taken by Toot or Human Resources regarding the accommodation request, ECF No. 28 at 18; and on May 1, 2013, Jeffries called Goodrich and told him that he was terminated because he was no longer on approved leave, ECF No. 28 at 18.

WellPoint argues that it granted a reasonable alternative to working from home because it granted Goodrich's request for an intermittent leave of absence for days that his medication prevented him from being able to work in the office. ECF No. 24 at 13. However, WellPoint's own Statement of Material Facts establishes that Goodrich submitted the request for intermittent leave before he requested permission to work from home. ECF No. 25 at ¶ 55. WellPoint has not identified any material fact which supports a conclusion that these two requests were related; as the party seeking summary judgment, it is not entitled to such an inference.

21

Viewing the summary judgment record in the light most favorable to Goodrich as the nonmoving party, a reasonable jury could find that WellPoint failed in its obligations to determine an appropriate accommodation in response to Goodrich's request.  Accordingly, WellPoint's motion for summary judgment is **DENIED** as to that issue.

### D.     Punitive Damages

Goodrich has requested an award of punitive damages against WellPoint.  ECF No. 1 at 8.  WellPoint contends that it maintains "comprehensive anti-discrimination, harassment, and retaliation policies with complaint-reporting and investigation procedures," ECF No. 24 at 15, and that Toot was required to certify annually "that he was responsible for reading, understanding, and abiding by these policies and procedures," ECF No. 33 at 8.  WellPoint also asserts that its Senior Human Resources Manager, Suzanne Hagerty, personally met with Toot and spoke with him regarding its Accommodations for Associates with Disabilities policy in early 2013.  ECF No. 34-2 at 2.  Consequently, WellPoint claims that it qualifies for the good-faith affirmative defense described by the United States Supreme Court in *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 544 (1999).  ECF No. 24 at 15-16.

Goodrich counters that a question of fact exists as to whether WellPoint actively enforced its non-discrimination policy because Toot admitted at his deposition that he did not know if WellPoint had a policy for responding to requests for medical accommodations.  ECF No. 30 at 17-18 (citing ECF No. 28-9 at 6).

In *Romano v. U-Haul, Int'l,* 233 F.3d 655, 670 (1st Cir. 2000), the First Circuit recognized that while an employer's written non-discrimination policy may be evidence of the employer's efforts to comply with Title VII, it is insufficient on its own to prove the *Kolstad* good-faith defense.[4]   An employer must also show that it made efforts to implement its non-discrimination policy by educating its employees and actively enforcing the policy.   *Id.*   Hagerty's declaration constitutes record evidence that WellPoint annually retrained Toot regarding its anti-discrimination and medical accommodation policies, and therefore, that it had an "active mechanism for renewing [Toot's] awareness of non-discrimination policies[.]"   *Romano*, 233 F.3d at 670. However, Toot's deposition testimony that he did not know if WellPoint had a policy for responding to requests for medical accommodation constitutes conflicting record evidence.   Because I must interpret the evidence in the light most favorable to Goodrich, as the nonmovant, and draw all reasonable factual inferences in his favor, I conclude that WellPoint has not met its burden of proving its active enforcement of its anti-discrimination policies.

Both parties have focused their punitive damages argument exclusively on whether a dispute of material facts exists as to WellPoint's good-faith defense, and neither party has cited material facts from which a reasonable jury could make conclusions about WellPoint's motive or intent.   *See* ECF No. 30 at 17-18.   As the party seeking summary judgment, WellPoint has the burden of demonstrating that

---

[4]   Title I of the ADA explicitly provides for the same remedies available for employment discrimination suits in Title VII of the Civil Rights Act of 1964.   *Rederford v. U.S. Airways, Inc.,* 589 F.3d 30, 37 (1st Cir. 2009) (citing 42 U.S.C. § 12117).

there are no facts from which a reasonable jury could conclude that it was motivated by malice, *see Tuttle v. Raymond,* 494 A.2d 1353 (Me. 1985), or that it acted with malice or reckless indifference to Goodrich's federally protected rights, *see Kolstad,* 527 U.S. at 534-35.   Accordingly, WellPoint's motion for summary judgment is **DENIED** with regard to punitive damages under the ADA and the MHRA.

## IV. CONCLUSION

For the foregoing reasons, WellPoint's motion for summary judgment (ECF No. 24) is **GRANTED IN PART** with regard to Goodrich's claims that (1) WellPoint failed to accommodate his disability by not holding his position open during his 14-month absence; and (2) WellPoint failed to accommodate his disability by not allowing him to return to work on a reduced schedule.

WellPoint's motion for summary judgment is **DENIED** in all other respects.

**SO ORDERED.**

This 5th day of August, 2015

_____
**JON D. LEVY**
**U.S. DISTRICT JUDGE**